

MEMO ENDORSED

December 31, 2020

**VIA ECF**
The Honorable Kenneth M. Karas
The Hon. Charles L. Brieant Jr.
Federal Building and United States Courthouse
300 Quarropas St.
White Plains, NY 10601-4150

Re: *United States v. Stephen Belliard,* 7:17-cr-00002-KMK

Dear Judge Karas:

We write in reply to the Government's opposition to Stephen Belliard's motion for a reduction in sentence pursuant to 18 U.S.C. § 3582(c)(1). The Government does not contest that Mr. Belliard has proffered "extraordinary and compelling reasons" for his compassionate release because his medical conditions—specifically, his obesity, hypertension, hyperlipidimia, undiagnosed anemia, and history of smoking—place him at serious risk for severe illness or death should he contract COVID-19. Gov't Resp. 5, ECF No. 105.[1] The Government argues, however, that the 18 U.S.C. § 3553(a) factors do not weigh in favor of release. *Id.* The Government's argument downplays the serious threat to Mr. Belliard's health should he remain incarcerated at Fort Dix and ignores the substantial factors in favor of a reduced sentence, including the non-violent nature of the offense of conviction; Mr. Belliard's exemplary conduct while incarcerated; and the fact that his sentence is longer than it otherwise likely would've been due to the application of a harsh mandatory minimum term.

**1. Mr. Belliard is at greater risk for severe complications from COVID-19 due to his medical conditions**

As explained in Mr. Belliard's initial motion, *see* Mem. in Support of Motion for Compassionate Release ("Mem.") 3–9, ECF No. 102-1, Mr. Belliard has obesity and hypertension and was a chronic smoker for many years. The CDC has recognized that all three conditions are linked to increased risk of serious complications from COVID-19. The risk to Mr.

[1] The Government seems to suggest that the existence of "extraordinary and compelling reasons" is determined by the commentary to the policy statement at Section 1B1.13 of the Sentencing Guidelines. *See* Gov't Resp. 4. The Government is mistaken: that Guidelines "now appl[ies] only to those [compassionate release] motions that the BOP has made." *United States v. Brooker*, 976 F.3d 228, 236 (2d Cir. 2020). When such a motion is brought by an incarcerated person directly, "the First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *Id.*

Belliard is increased by his hyperlipidimia, which studies have linked to a heightened risk from COVID-19, as well as the likelihood that he has undiagnosed and untreated anemia. *See id.* at 7–9. And the concurrent presence of multiple aggravating comorbidities raises the likelihood of serious complications even further. *See id.* at 9–11. Accordingly, if Mr. Belliard were to contract COVID-19, the consequences could well be dire.

**2. The outbreak at Fort Dix is serious and growing worse**

When Mr. Belliard filed his motion on December 22, the BOP was reporting 17 positive cases of COVID-19 among inmates and 18 among staff. *See* Mem. 12. Less than a week later, on December 28, we filed a letter notifying the Court that the number of active infections among inmates had skyrocketed to 295. *See* Letter, ECF No. 103. As of yesterday, December 30, there were 442 active cases; today, December 31, there are 586. *See* BOP: COVID-19 Update, https://www.bop.gov/coronavirus/ (updated Dec. 31, 2020). Fort Dix currently has more active cases of infection than any other federal facility. *Id.* And the true number of infections may well be greater—241 inmates are currently awaiting tests. *Id.*

Put simply, Fort Dix is "experiencing a surge in the number of COVID-19 cases among inmates and staff." Ex. J, Notice to Inmate Population. And the surge is not limited to the low security facility—there are also an undisclosed number of active infections in the Camp, where Mr. Belliard is housed. *Id.* This increase in cases shows no signs of slowing, and the measures taken by Fort Dix are plainly inadequate to prevent the spread of the virus.

The Government contends that the Court need not concern itself with the outbreak at Fort Dix, however, because, the Government asserts, it has not significantly affected the Camp, which the Government represents had seen no more than three infections as of December 28. Gov't Resp. 7. But the Government acknowledges that this figure may well be out of date; the virus spreads rapidly, and three infections can quickly multiply—as the growth in infections since this motion was filed too readily demonstrates. Indeed, the number of active known cases grew at Fort Dix by 144 since *yesterday*.

The Government contends that the precautionary measures taken by Fort Dix are sufficient to protect inmates. Gov't Resp. 7. But that is plainly untrue. As recently as October, Fort Dix had only five active cases. *See* Opinion and Order 6, *United States v. Fernandez*, No. 12 Cr. 844 (AJN), ECF Docket No. 468 (S.D.N.Y. Oct. 14, 2020). But, far from dying out, the pandemic spread—as is virtually inevitable in the confined space of a prison. The Government predicts, essentially, that what has already happened in Fort Dix as a whole cannot possibly happen in the Camp—that three infections surely will not become 10, or 100. Recent experience proves how unrealistic that hope is.

Moreover, even three infections *in the very unit where Mr. Belliard is housed* is too many for comfort. The Government represents that these three inmates have been moved, but there is no guarantee that they did not infect others before that happened. "It can take up to 14 days after exposure to the virus for a person to develop COVID-19 symptoms. A negative result before end of the 14-day quarantine period does not rule out possible infection." *Frequently Asked Questions* (updated Dec. 31, 2020), https://www.cdc.gov/coronavirus/2019-

ncov/faq.html#Contact-Tracing. And the Government represents that the *entire* A wing of the Camp, which includes Mr. Belliard, is now in quarantine. This may help prevent the virus from spreading *out* of the A wing, but it poses the opposite risk to inmates, like Mr. Belliard, who are now forced to live in close proximity with people who may have been infected by the recently-moved inmates. Notably, too, the Government does not claim that guards and prison staff do not move between the Camp and the low-security facility. "[E]ven though inmates may not move between [Fort Dix's] various facilities, prison staff and guards do, and they may bring the virus with them." *United States v. Williams-Bethea*, 464 F. Supp. 3d 562, 569 (S.D.N.Y. 2020).

Finally, the Government suggests that Mr. Belliard might be safer at Fort Dix than in the community. Gov't Resp. 8. "This argument strains credulity." *Williams-Bethea*, 464 F. Supp. 3d at 569. As Judge Nathan explained:

> As the Court has repeatedly discussed, no matter the measures taken by the BOP, carceral settings inhere with qualities that make viral transmission of communicable diseases like COVID-19 likely. Yet in her Queens home, Ms. Williams-Bethea will be able to quarantine, limit interaction with individuals outside her family, and take all other precautions recommended by the Centers for Disease Control. The Government cannot plausibly compare the risks posed by the virus to Ms. Williams-Bethea while she is incarcerated to those while she is in her home, and the Court rejects this argument.

*Id.* at 569–70 (citation omitted). Similarly, Mr. Belliard has already explained that, if released, he would be able to quarantine in a separate bedroom in his family's home. Mem. 22. After quarantining, he could practice proper social distancing and hygiene. He would be living only with his wife and three daughters, instead of in open dormitory-style housing with 60 other men. In short, the risks to his health upon release would be far, far less than the risks of continued incarceration.

**3. The 3553 factors favor reducing Mr. Belliard's sentence**

Despite the Government's arguments to the contrary, the 3553 factors in Mr. Belliard's case weigh heavily in favor of a sentence reduction.

The Government emphasizes Mr. Belliard's criminal past, but overlooks key details. Mr. Belliard's conviction for second degree robbery occurred when he was only *16 years old*. PSR ¶ 31. The offense, committed with three others and not involving any weapons, resulted in a probationary sentence and a Youthful Offender adjudication. At the time of the offense, Mr. Belliard, who as noted above was only 16, had dropped out of school and was living in an apartment by himself with no adult supervision. He was also in the throes of an addiction that began when he started smoking marijuana and drinking when he was 12 years old, and progressed to the point that when he was 16 he was drinking and smoking marijuana daily. PSR ¶ 56. In light of the mitigating circumstances, Mr. Belliard's youthful offense, which occurred more than 20 years before the offense of conviction and yielded 0 criminal history points, should not prevent the Court from granting compassionate release in Mr. Belliard's case.

Case 7:17-cr-00002-KMK Document 108 Filed 01/06/21 Page 4 of 8

Mr. Belliard's prior drug conviction in 2008 was for a possession offense that was not alleged to have involved any violence. Mr. Belliard acknowledges that his drug offense in 2008 was very serious, as was his offense in this case. But neither of them involved violence or gang activity. Additionally, as noted in Mr. Belliard's compassionate release motion, Mr. Belliard has already served more than half of his sentence for this admittedly serious offense, in extremely harsh conditions due to the unprecedented pandemic. *See* Mem. 20–21. No matter how serious his non-violent drug offenses were, the offenses simply do not warrant a death sentence or exposure to potentially lifelong health complications. Mr. Belliard, who the government concedes is at high-risk and is currently helpless at Fort Dix to protect himself through social distancing and proper hygiene in the midst of a raging outbreak, could very well face these catastrophic and grossly disproportionate consequences if he is not granted relief.

Further, both Mr. Belliard's prior offenses and this offense were inextricably intertwined with Mr. Belliard's serious drug addiction that began when he was 12. Mr. Belliard has now already been five years sober, and he has participated in drug treatment programming and counseling to address the root causes of his addiction, which will fortify him to pursue a law-abiding future.

Mr. Belliard's strong family support is also a compelling factor weighing heavily in favor of release. This Court has already recognized that the love and support of Mr. Belliard's family will be a powerful motivating factors to keep him out of trouble. The record in this case, the Court observed, was "good" and it was "compelling" that Mr. Belliard's "family continue[d] to support [him]." Sentencing Tr. 15. That was, in the Court's words, "cause for optimism." Sentencing Tr. 16.

The Government downplays this, arguing that Mr. Belliard's family did not stop him from committing the instant offense. Gov't Resp. 6. But this cynical response ignores the concrete evidence of Mr. Belliard's rehabilitation. By the time of sentencing, Mr. Belliard had already been incarcerated for two and a half years, during which time he threw himself wholeheartedly into constructive programming. *See* Mem. 2. As the Court observed, Mr. Belliard had done "incredibly valuable work in prison," and it appeared that the "difficult lifestyle" of incarceration had motivated Mr. Belliard to "get back to [his] family." Sentencing Tr. 14. And Mr. Belliard has continued his commitment to rehabilitation since his sentencing—he has engaged in all the programming that is available to him, on a diverse array of subjects, all while maintaining a spotless disciplinary record.

The Government also ignores the evidence that this conviction—Mr. Belliard's first in the federal system—marked a turning point. As his lawyer expressed at sentencing, this conviction and his associated incarceration pre-trial helped Mr. Belliard to realize that "he d[id] not ever wish to be in jail and be away from his family and friends again." Sentencing Tr. 5. The Court recognized this, noting that this could be "a story of, you know, two stories. The [story] of before arrest in a federal case and after," and that Mr. Belliard was "well on [his] way to being able to tell that story." Sentencing Tr. 13–14.

The criminal justice system is founded upon a belief in rehabilitation—a belief that, no matter the mistakes of our past, we can make the decision to own up to our wrongdoing and chart

Case 7:17-cr-00002-KMK Document 108 Filed 01/06/21 Page 5 of 8

a better course forward. During his incarceration, Mr. Belliard has demonstrated his sincere commitment to self-improvement and to being the father that his family deserves. There is no doubt that the path ahead will be difficult—that, as the Court recognized, Mr. Belliard cannot "give in to the temptation" of ever being involved in criminal activity again. Sentencing Tr. 14. But Mr. Belliard's commitment to turning his life around is demonstrated and sincere. The Government's myopic focus on his past ignores the very real reasons for hopefulness in his future.

**4. Mr. Belliard's sentence was rendered excessive by the application of the 10-year mandatory minimum**

As Mr. Belliard argued in his motion, the application of a 10-year mandatory minimum rendered his sentence far longer than it likely would have been otherwise. Evidencing this, Mr. Belliard's co-defendant, Jose Rodriguez, received only a five-year sentence, despite pleading guilty to the same counts and the same drug weight. *See* Mem. 18. Indeed, the disparity between their sentences is so great that Mr. Rodriguez was transferred to a halfway house more than a year ago, and was released in June of this year. *Id.*

The Government argues that the disparity between Mr. Belliard's sentence and Mr. Rodriguez's sentence is justified because Mr. Belliard has two prior felony convictions, while Mr. Rodriguez's only prior conviction was for a misdemeanor. Gov't Resp. 6. As explained above, Mr. Belliard's prior convictions—one of which occurred more than 20 years prior to the instant offense, when Mr. Belliard was only 16—should not weigh heavily against him now. But even assuming this justified *some* difference in their sentences, there is no reason to believe that it justified Mr. Belliard receiving a sentence that is *double* Mr. Rodriguez's. Notably, Mr. Rodriguez's Guidelines range was 70 to 87 months, but this Court issued a below-Guidelines sentence of the mandatory minimum of five years. *See* Mem. 18. In contrast, Mr. Belliard's Guidelines range—which fully accounted for his prior convictions—would have been 97 to 121 months, but due to the mandatory minimum this Court was constrained to impose a sentence at the very top of that range. *See* Mem. 17.

The Government also suggests that a harsher sentence was appropriate for Mr. Belliard based on the "reasonable inference" that Belliard ran the operation, because he was the one with the key to the apartment where the drugs are stored. Gov't Resp. 6. This is, to put it mildly, a slender reed upon which to rest the Government's claim that Mr. Belliard was the mastermind.[2] More importantly, the Government never suggested at sentencing that the Court should base its sentence on Mr. Belliard's supposedly greater degree of culpability, and the Court accordingly never made any findings accepting the Government's present allegations.

---

[2] It is a particularly unsustainable argument because, although Mr. Belliard may have held the key to the apartment, Mr. Rodriguez at the very least kept a key to the building. *See* Gov't Mem. In Opp. To Motion to Suppress 3, ECF No. 38 ("[S]urveillance video showed two Detectives from YPD (the 'Detectives') walk up to the locked entrance to the lobby, which Rodriguez . . . opened for them.").

Case 7:17-cr-00002-KMK Document 108 Filed 01/06/21 Page 6 of 8

The Government also emphasizes that Mr. Belliard's co-defendant submitted to a safety valve proffer, and suggests that his detailed proffer justifies the five-year sentencing disparity between Mr. Belliard and his co-defendant. But Mr. Belliard's one prior non-violent drug conviction precluded him from even being eligible for the safety valve. Thus, Mr. Belliard did not refuse to submit to a safety valve proffer, he simply did not have the opportunity.

Finally, even if this Court was inclined to sentence Mr. Belliard more harshly than Mr. Rodriguez, there is still reason to believe the sentence imposed would have been well below 10 years, but for the mandatory minimum. Mr. Belliard has been incarcerated, at this point, for a full year longer than Mr. Rodriguez; there is no doubt that he has been punished more harshly. And while Mr. Rodriguez was released to a halfway house prior to the pandemic, Mr. Belliard has been incarcerated. Due to the dangers posed by COVID-19, as well as the severe restrictions on programming and visitation implemented in an attempt to control the pandemic, "[t]he actual severity of [Belliard's] sentence . . . exceeds what the Court anticipated at the time of sentencing." United States v. Davis, No. CR TDC-15-0116, 2020 WL 6785351, at *3 (D. Md. Nov. 18, 2020). "Under these circumstances, a reduced sentence would still reflect the seriousness of the offense, promote respect for the law, and provide just punishment." *Id.*

**5. Conclusion**

Mr. Belliard has already served a significant term of imprisonment for a non-violent drug offense. His sincere commitment to rehabilitation is demonstrated by his model behavior and his completion of numerous programming opportunities. He is at serious risk of severe complications or death should he contract COVID-19, and Fort Dix has proven itself incapable of controlling the present outbreak. Mr. Belliard respectfully requests that the Court reduce his sentence to time served and release him to home detention.

Sincerely,

/s/ Kristen M. Santillo
Kristen Santillo

Application for compassionate release under Section 3582 is granted. The COVID numbers have reached problematic levels in the camp where Mr. Belliard is being housed, proving that BOP has been unable to protect the staff and inmates at Fort Dix. This is of particular concern to Mr. Belliard, who undeniably suffers from several health ailments that science has said involve higher risks from contracting COVID-19. While releasing Mr. Belliard from prison will not assure his health, it will allow him the opportunity to manage his risks of exposure to the coronavirus. Moreover, the Section 3553(a) factors do not justify his continued detention in light of profound health risks he is facing. The offense of conviction, while serious, did not involve acts of violence and Mr. Belliard has exhibited meaningful steps toward rehabilitation. While he has a criminal history, Mr. Belliard has served a substantial portion of a substantial sentence and appears to have the support of his family. For these reasons, the application is granted. All the conditions of supervised release that were originally imposed remain the same.

So Ordered.

1/6/21

# EXHIBIT J

**NOTICE TO INMATE POPULATION**
**December 29, 2020**

FCI Fort Dix is experiencing a surge in the number of COVID-19 cases among inmates and staff similar to the current surge in the local community and throughout our country. There are currently active inmate cases on the East and West compounds and the Camp. As a result, numerous units are on isolation and on quarantine status, in accordance with Bureau of Prisons and the Center for Disease Control guidelines.

It is important to continue to follow prevention and control measures such as wearing a mask at all times; frequent sanitation, social distancing and reporting of symptoms; including fever, cough, shortness of breath, new-onset trouble speaking, loss of taste or smell, fatigue, muscle or body aches, sore throat, and stuffy/runny nose, which may occur within 2 to 14 days of exposure.

| AREA TO BE CLEANED | FREQUENCY OF CLEANING | FREQUENCY OF DISINFECTION |
|---|---|---|
| Windows/Window Ledges | Daily | Daily |
| Toilets/Sinks | Daily | Daily |
| Trash Receptacles | Empty three times daily, or as needed; clean daily | Daily |
| Floors, Stairs, and Other Walking Surfaces | Sweep and damp-mop daily | Daily |
| Telephones | Multiple times daily | After each use |
| Microwave Ovens | Clean daily and when visibly dirty | Daily |
| Drinking Fountains | Multiple times daily | Disinfect when cleaning |
| Door/Door Jams | Multiple times daily | Disinfect when cleaning |
| Mop Sinks | Rinse and clean after every use | After each use |
| Mop Buckets | Empty and rinse after every use | After each use |
| Wet-Mop Heads | Replace with a clean mop head after each use | Launder used mop heads daily |
| Dust-Mop Heads | Replace with a clean mop head after each use | Launder used mop heads daily |
| Furnishings | Daily cleaning of multi-use common area furniture (chairs, tables, etc.) | Disinfect when cleaning |